THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

E*TRADE Financial Corporation,   )
      Plaintiff,   )
         )   18 C 5908
v.   )
         )   Ronald A. Guzmàn
Heather Pospisil,   )
      Defendant.   )

## MEMORANDUM OPINION AND ORDER

For the reasons stated herein, E*TRADE's motion for a temporary restraining order [4] is granted as provided herein. E*TRADE's motion for discovery and a preliminary injunction hearing is denied.

## STATEMENT

Before the Court is E*TRADE's complaint for injunctive relief pending arbitration and its motion for a temporary restraining order ("TRO") as well as expedited discovery. E*TRADE is a corporation organized and existing under the laws of Delaware with its principal place of business in New York. Heather Pospisil ("Pospisil") is an individual who currently resides in either Arizona or Illinois.[1] Venue is proper in this Court because: (1) Pospisil was employed in E*TRADE's Chicago, Illinois office from December 2, 2013 through August 2, 2018; (2) the agreements at issue were entered into in Chicago, Illinois; and (3) Pospisil has allegedly been soliciting E*TRADE's clients in Chicago, Illinois.

E*TRADE is in the business of providing financial services to a wide variety of clients. Unlike traditional broker-dealers, E*TRADE's clients conduct the vast majority of their business through E*TRADE's website and mobile application, and most of E*TRADE's more than 3.6 million accountholders conduct business over the internet without ever speaking to an individual broker or financial consultant. Historically, E*TRADE has attracted clients through extensive advertising in various media outlets rather than through direct solicitations of individual clients by financial consultants. E*TRADE has developed extensive client lists and databases regarding its most profitable corporate clients and individual clients. Pospisil served as a financial consultant for E*Trade from December 2, 2013 until August 2, 2018, when she resigned her position to work for one of E*TRADE's competitors, Morgan Stanley.

It appears undisputed that E*TRADE takes substantial precautions to maintain and protect the secrecy of its clients' private information, which is contained on a proprietary

---

[1] Plaintiff is directed to file a supplement to its complaint no later than September 5, 2018 at 5 p.m. alleging Pospisil's citizenship (as opposed to residency) as required for diversity jurisdiction.

computer network and secured by password and user ID protections to prevent unauthorized access. Moreover, E*TRADE limits access to client information to those employees who have a need to know it, and requires employees to agree to maintain the confidentiality of proprietary client information. E*TRADE circulates to its employees a Code of Professional Conduct, which contains detailed information regarding the use of its clients' information. During her employment as a financial consultant, Pospisil had access to information concerning all 3.6 million of E*TRADE's brokerage clients. Pospisil's clients were not solicited by her nor were they clients from a previous employment; rather, they were existing or new E*TRADE clients to whom Pospisil was assigned. As indicated, Pospisil recently became employed by Morgan Stanley.

In the motions currently before the Court, E*TRADE alleges that Pospisil is actively soliciting clients away from E*TRADE in direct violation of both her duty of loyalty and the Nonsolicitation and Nondisclosure Agreement ("Agreement") she entered into while an employee of E*TRADE. E*TRADE moves the Court for a temporary restraining order to enjoin Pospisil from contacting and/or soliciting E*TRADE's current or prospective customers and requests that the Court require Pospisil to show cause why a preliminary injunction should not issue against her. In the alternative, E*TRADE asks that the Court issue an order permitting immediate discovery. In support, E*TRADE contends that it has been irreparably harmed by the loss of the relevant client accounts and that unless she is enjoined, Pospisil will continue to be divert E*TRADE clients to her new employer. A party seeking a temporary restraining order "must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest." _Winnig v. Sellen_, 731 F. Supp. 2d 855, 856 (W.D. Wis. 2010).

On December 2, 2013 Pospisil entered into the "Agreement", which provides in part that:

- [Pospisil] acknowledges that [E*TRADE's] business is highly specialized, the identity and particular needs of [E*TRADE's] clients are not generally known, and some or all of the documents and information regarding [E*TRADE's] finances, clients, services, methods of operation, sales, pricing, and costs are highly confidential. [Pospisil] further acknowledges that the services rendered to [E*TRADE] by [Pospisil] have been or will be of a special and unusual character that have unique value to [E*TRADE] and that [Pospisil] has had or will have access to trade secrets and Confidential Information belonging to the Company, the loss of which cannot be adequately compensated by damages in an action at law. (Compl., Ex. B at ¶ 1.)

- Both during and after [Pospisil's] employment with [E*TRADE], [Pospisil] will not, without [E*TRADE's] prior permission, directly or indirectly utilize or disclose to anyone outside of [E*TRADE], or permit access by unauthorized persons or entities to, any Confidential Information, and will take all reasonable precautions to prevent any person or entity access to any of the Confidential Information.... Employee shall not, directly or indirectly, copy, take, send, or remove from [E*TRADE's] premises or computer systems

- (except with the written consent of [E*TRADE]), any of [E*TRADE's] books, records, client lists, electronic data information, or any other documents or materials containing Confidential Information.

- The term "Confidential Information" as used in this Agreement is defined as non-public information of value to [E*TRADE] that [Pospisil] learned in connection with [her] employment with [E*TRADE] and that would be valuable to a competitor. Confidential Information includes, but is not limited to … c. Information regarding [E*TRADE's] clients, such as client data resident on databases available to [Pospisil], as well as pricing arrangements, investment preferences, risk tolerances, trading or account histories or tendencies, positions, and contact information, and other [E*TRADE] information which is not generally known to the public and which (a) is generated, collected by, and/or utilized in the operations of [E*TRADE] and relates to the actual or anticipated business, research or development of [E*TRADE]; or (b) is suggested by or results from any task assigned to [Pospisil] by [E*TRADE] or work performed by for or on behalf of [E*TRADE]. (*Id.*, ¶ 4) (emphasis in original)).

- During the term of [Pospisil's] employment with [E*TRADE] and for a period of one year from the voluntary or involuntary termination of [Pospisil's] employment with [E*TRADE], [Pospisil] will not, directly or indirectly, solicit, induce, or attempt to solicit or induce, any Client or Potential Client of [E*TRADE] to purchase from [her] or any other person, firm, partnership, corporation, limited liability company, or other entity, goods or services competitive with those offered and/or provided by [Pospisil] during [Pospisil's] previous two years of employment with [E*TRADE] or that [Pospisil] possessed Confidential Information about during [her] employment with [E*TRADE]. (*Id.*, ¶ 6.)

- [Pospisil] agrees that upon termination of employment or, prior to such termination at the request of [E*TRADE], [she] shall return to [E*TRADE] all documents, copies, recordings of any kind, papers, computer records or programs, drawings, manuals, letters, notes, notebooks, reports, formulae, memoranda, client lists, and other material in [her] possession or under [her] control…. (*Id.*, ¶ 7.)

E*TRADE contends that Pospisil accessed and downloaded an extensive list of client information between 11:20 p.m. on July 31, 2018 and 4:06 a.m. on August 1, 2018, just two nights before she resigned (Dkt. #5, Pl.'s Mem. Support at 4.)  E*TRADE's declaration in support of that assertion (Dkt. #7, Koehler Decl.,) states only that she accessed the information; nevertheless, Pospisil could have copied the information by hand or cut and pasted it using a word processing program.  Further, the number of client files Popsipil accessed during this one overnight session accounted for 77% of all documents she accessed during the period beginning July 13, 2018 and ending on the date of her resignation; it was, therefore, a significant amount of computer information downloading activity.  The amount of activity and the hours over which she accessed the information only two days before she resigned is suspicious.  That she had a definite purpose for accessing such information in this manner at this hour of the night cannot be

doubted.  A reasonable inference is that she accessed this information in order to use it in relation to her imminent resignation and move to a competitor.  Supporting this inference is the further evidence that Pospisil contacted at least some of her E*TRADE clients either prior to and after her departure, at least four of whom then transferred their business to Pospisil shortly after she moved to Morgan Stanley.  The number of such clients is not particularly large, but the accounts totaled some $4.2 million in managed assets and approximately $4.4 million in total assets.  Pospisil's response essentially boils down to an admission that she did contact these clients, but only for the "permitted" purpose of informing them of her new position and contact information, and that she did not attempt to solicit their business, either directly or indirectly.

The Court is not convinced.  Assuming *arguendo* that her purported use of names and contact information of the clients E*TRADE had provided to her as solely for the purpose of announcing her departure and future contact information was not itself a breach of the Agreement, the details of the manner in which she went about "informing" these clients strongly favors an inference that her real intent was to solicit them as customers in her new position.  If Pospisil's intent was simply to inform her clients of her move to another brokerage, one would expect a mass mailing or an email containing a simple announcement.  In addition to being much less time consuming, such a communication would have the further advantage of documenting that no solicitation took place.  Given the extensive Agreement she signed, it had to have been clear to her that contacting clients over the telephone or personally would be a contentious issue if those clients followed her to her new employment.  A one-on-one conversation, the content of which is undocumented, is a more likely method of recruitment than an impersonal notice by mail.  Furthermore, it appears that one of the clients who left E*TRADE also accompanied her to a Chicago Cubs baseball game shortly before her departure.  This seems very much like a recruitment effort.

To be sure, Pospisil submits "declarations" of her own and those of the clients she allegedly stole from E*TRADE.  But the Court finds these declarations unconvincing because they are not notarized or made under penalty of perjury.  Granted, the evidentiary rules can be relaxed for TROs, but sworn statements would certainly have carried more probative value.  Even more significant however, is the form of the statements in that they all repeat the same boilerplate, conclusory, and formalistic language.  None of the declarations provide any background information as to when or how the declarant came to first learn of Pospisil's new employment or, most importantly, what was actually said during their conversations.  Moreover, the conclusory statements "I didn't solicit" or "she didn't solicit" are unhelpful, especially when Pospisil's definition of "solicit" doesn't appear to jibe with Illinois law.

Pospisil argues that the information she used was public and non-confidential, even the customer lists. (Dkt. #11, Def.'s Resp. at 8-9.)  But this case is distinguishable from the ones Pospisil cites because in those cases, the customer lists were not trade secrets given that anyone could easily duplicate them.  The Court is at a loss as to how one would easily duplicate E*TRADE's customer lists by using only public information.  Pospisil's assertion that she looked up her clients' contact information on publicly-available databases is a non-starter since she had to use the client lists as a starting point.  Under Illinois law, a trade secret can be misappropriated by physical copying or memorization.  *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 217 (Ill. App. Ct. 1995) ("Using memorization to rebuild a trade secret does not

transform that trade secret from confidential information into non-confidential information."). Nor is it necessarily "completely permissible" to contact clients by telephone to provide new contact information, as Pospisil contends. The only authority she cites is *Oblon*, which appears to be an oral ruling by Judge Holderman in a 1999 case that is not available on Westlaw or the Court's electronic database. In reality, the inquiry is more nuanced, as at least one Illinois court has noted:

> Whether a particular client contact constitutes a solicitation, depends upon the method employed and the intent of the solicitor to target a specific client in need of his services. . . . [T]he direct solicitation of insurance customers, as opposed to a general advertisement, suggests a private communication directed at a person or persons, known by the solicitor to have an immediate or potential need for insurance.

*Tomei v. Tomei*, 602 N.E.2d 23, 26 (Ill. App. Ct. 1992). Illinois law does not require an express request for business in order for a solicitation to occur. *Henry v. O'Keefe*, No. 01 C 8698, 2002 WL 31324049, at *5 (N.D. Ill. Oct. 18, 2002).

In finding that the plaintiff had a likelihood of success on its claim that the defendant violated a non-solicitation covenant where the defendant had personally contacted the former customers who he knew had a need for his financial services and informed them that he had joined a competitor, one Court put it this way:

> Although there is a significant distinction between mere contact and solicitation, courts have found conduct similar to Cross' conduct in this case to be solicitation . . . . In this case, Cross personally contacted Merrill Lynch customers and admits that these customers have a need for his financial services. Moreover, Cross did not simply contact previous customers to provide them with information as to his whereabouts. In one affidavit the affiant states that Cross sent a letter to a Merrill Lynch customer, enclosing a form for the customer to complete to transfer his account to Dain Rausher. Thus, it appears that Cross is engaging in conduct that clearly constitutes solicitation. Further, we find significant that Cross personally phoned the Merrill Lynch customers, using confidential records and information he obtained from Merrill Lynch. Customer lists are entitled to trade secret protection under Illinois law. Based on the foregoing, the court finds that Merrill Lynch has shown a better than negligible chance of prevailing on the merits of their claims.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, No. 98 C 1435, 1998 WL 122780, at *2 (N.D. Ill. Mar. 13, 1998).

Here, Pospisil acknowledges that she made phone calls to her specific clients whom she knew had a need for her services. She did not send a simple announcement. This case is therefore at least partly distinguishable from *O'Connor*. For all of the foregoing reasons, the Court finds that plaintiff has established at least a greater than negligible likelihood of success on the merits.

E*TRADE contends it has no adequate remedy at law for the injuries it is currently suffering as a result of Pospisil's wrongful conduct because the full extent and scope of E*TRADE's losses are not ascertainable. Pospisil disagrees, arguing that there are experts who can quantify the loss of future income plaintiffs will suffer as a result of any client accounts it may lose. The Court disagrees. Estimating the length of time any given client would remain with E*TRADE, and therefore the amount of future income E*TRADE will lose, would be extremely difficult. There are conflicting forces at work. Financial planning is sometimes done on the basis of a long-range investment strategy and one could expect such clients to remain with their financial advisor for a significant period of time. On the other hand, other client accounts are more interested in trading than in long-term financial plans and estimating how long any such clients will remain with a particular broker would appear to be next to impossible given the ups and downs of the market. Competition for investment accounts is strong and clients may be lured away on any given day. Additionally, the market itself may conspire to cause one category of clients or another to blame its lack of success on its financial advisor and seek new advice.

It is precisely the difficulty of pinning down what business has been or will be lost that makes an injury "irreparable." See *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). Furthermore, competition changes probabilities: "Illinois recognizes this. It treats ongoing competition itself as a sufficient basis for relief." *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–33 (7th Cir. 2005). Not only is the economic harm difficult to quantify, if Pospisil is not enjoined, it is not clear how many clients will follow suit in the future. Specifically, because Pospisil has now used E*TRADE's confidential information to solicit clients away, there is no way to "unring" the bell, as the clients cannot be forced to return to E*TRADE. The court finds that E*TRADE has made a sufficient showing of an inadequate remedy at law and a likelihood of irreparable harm absent an injunction.

In addition, the harm faced by E*TRADE outweighs any risk to Pospisil posed by injunctive relief as Pospisil has already contacted by telephone all of her previous clients. Moreover, Pospisil does not challenge the validity of the Agreement or its prohibition against solicitation. Thus, restraining her from violating the provisions of these agreements is not a cognizable harm and that E*TRADE is entitled to a temporary restraining order.

E*TRADE seeks: (1) an order prohibiting Pospisil from further using E*TRADE's confidential information; (2) an order prohibiting Pospisil from further soliciting E*TRADE's clients; and (3) an order requiring that Pospisil return all of E*TRADE's confidential information, as defined and required in the Agreement. The Court orders that: Pospisil is enjoined from further using E*TRADE's confidential information and is also enjoined from further solicitation of E*TRADE's clients. Pospisil is ordered to return all of E*TRADE's confidential information as defined in her employment agreements. Because Pospisil has already notified all her clients by phone of her change of employment and her new contact information, any further communications with clients who have not already responded that they wish to transfer their accounts would be unnecessary and could only be for the purposes of soliciting the transfer of their business. Thus, Pospisil is barred from initiating any further contacts from clients who have not already communicated a desire to transfer their accounts to her new employment while this temporary restraining order is in effect.

E*TRADE also seeks an order allowing expedited discovery, which the Court denies. Given that there is no dispute that the parties have agreed to submit the underlying dispute to arbitration before the Financial Industry Regulatory Authority ("FINRA") and that E*TRADE has filed a statement of claim with FINRA commencing an arbitration action against Pospisil, it is difficult to see why the Court can or should wade into the issue of discovery (or set a hearing for a preliminary injunction.) Under FINRA Rule 13804, FINRA will set an arbitration hearing on permanent injunctive relief within 15 days of the issuance of the TRO. A preservation order will suffice to maintain the status quo. Therefore, the Court further orders Pospisil to preserve all data, whether hardcopy or electronic data on computers, smart phones or any other electronic storage media or devices in her possession or control, which contain information in any way related to her change of employment, including but not limited to, the means, manner and content of any communications with any E*TRADE clients regarding her change of employment from E*TRADE to Morgan Stanley.

Pospisil's motion for arbitration is denied as moot based upon E*TRADE's representation that it has filed a statement of claim commencing arbitration contemporaneously with its filing of its Complaint for Injunctive Relief. This temporary restraining order is entered on the 4th day of September 2018 at 5:40 p.m. and remains in effect through 5:40 p.m. on the 18th day of September 2018.

**Date:** September 4, 2018

_____
**Ronald A. Guzmàn**
**United States District Judge**